UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MGM ELITE TRUCKING LLC,
a Florida company, DSM LEGACY LLC
a New Hampshire company, MO7 Holdings
LLC, a Florida company, and PLANT GREAT
SEEDS LLC, a Florida Company,

    Plaintiffs,

vs.

AKL TRANSPORT LLC,
a Georgia company,
SOUTHERN TRUCK LEASING LLC,
a Georgia company, and
KRISTOPHER A. LUNSFORD;

    Defendants.

Case No.: 25-cv-01507-TPB-NHA

JURY TRIAL REQUESTED

## FIRST AMENDED COMPLAINT

Plaintiffs MGM Elite Trucking LLC, DSM Legacy LLC, MO7 Holdings LLC, and Plant Great Seeds LLC hereby file this Amended Complaint against Defendants AKL Transport LLC, Southern Truck Leasing LLC, and Kristopher A. Lunsford and allege as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff MGM Elite Trucking LLC ("MGM") is a Florida company with a principal place of business at 13233 Sawpalm Creek Trail, Lakewood Ranch, FL 34211.

2. Plaintiff DSM Legacy LLC ("DSM") is a New Hampshire company with a principal place of business at 353 Exeter Road, Hampton Falls, NH, 03844.

3. Plaintiff MO7 Holdings LLC ("MO7") is a Florida company with a principal place of business at 11213 77th St. E, Parrish, FL 34219.

4. Plaintiff PLANT GREAT SEEDS LLC ("PGS") is a Florida company with a principal place of business at 13233 Saw Palm Creek Trail, Bradenton, FL 34211.

5. Upon information and belief, Defendant AKL Transport, LLC ("AKL") is a Georgia company that provides in public filing its service address as 1226 Birdsong View, Dacula, GA 30019.

6. Upon information and belief, Defendant Southern Truck Leasing, LLC ("Southern") is a Georgia company that provides in public filing its service address as 8735 Dunwoody Place, Ste. N, Atlanta, GA 30350.

7. Upon information and belief, Defendant Kristopher A. Lunsford ("Lunsford") is an individual who resides at 5767 Gene Sarazen Drive, Brasselton, GA 30517.

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between the parties, and more than $75,000 is at issue in this action, exclusive of fees, costs and interest.

9. This Court has personal jurisdiction over Defendants pursuant to Florida Statutes, Section 48.193 because Defendants 1) conducted business in this state through an agent; 2) committed tortious acts in this state; 3) caused injury to persons in this state by act or omissions outside this state while the defendants were engaged in solicitation or service activities in this state; 4) breached contracts in this state by failing to perform acts required by the contract in this state; and 5) are engaged in substantial and not isolated activity in this state.

10. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and as the relationship and subsequent business ventures specifically giving rise to the Plaintiffs' claims were created and continuously operated in and out of this District.

## FACTUAL ALLEGATIONS

11. At all times relevant hereto, Lunsford held himself out as the creator of a business model that produced high profits based on his ability to buy used semi-trucks in bulk at a discount, and his experience and established network for finding loads and drivers for the trucks.

12. Lunsford represented that the potential profits of his business were limited only by the number of trucks he could put into service. He claimed that a truck on the road would generate between $8,000 and $10,000 per week. Lunsford represented that he could purchase and deploy trucks and generate significant profits. Lunsford represented that he sought capital so that he could put more trucks on the road.

13. Lunsford provided a second rationale for structuring his business as he had. He explained that by recruiting outside companies to become the lessees of trucks, that he would be able to show that his companies had a wide and varied customer base, making his companies more attractive to eventual suitors. In this context, Lunsford's motivation for others to profit from his model made sense.

14. Lunsford created a model under which someone wishing to participate in the program would form an LLC to contract with Southern and AKL, two companies owned and controlled by Lunsford. He would demand from prospects an upfront payment of approximately $25,000-$35,000[1] for the right to lease a truck, as well as signatures on a lease from Southern and a truck management contract with AKL. Southern would purchase a truck and in five weeks would assign a vehicle identification number (VIN) for a truck to the lease contract, thereby leasing the truck to the participant for five years with an option to buy. AKL would maintain and dispatch the truck, coordinating loads and drivers to generate weekly revenues. From those revenues, $700

---

[1] The exact amounts varied over time. These figures were the most commonly used.

weekly lease payments would be paid to Southern, the remainder paid to those participating in the program.

15. Sarah Moshier (Moshier) became aware of Lunsford's program in or around January 2024. To her, Lunsford's program appeared to be an excellent and safe business opportunity for many reasons.

16. Many of Lunsford's close friends had obtained trucks from Lunsford, including Sarah Moshier's brother Joshua Tannariello, who believed that Lunsford had a solid business model. His opinion carried weight for Moshier because he had been involved in the trucking business since 2008. Moshier herself did not have experience in the trucking industry.

17. Moshier's family members, including Moshier's father and siblings, were some of the first to buy into Lunsford's program. Before Moshier was ever involved, her family had paid millions of dollars into the program.

18. Lunsford made weekly payments to people Moshier knew in Florida, further increasing Moshier's belief that Lunsford had found a profitable market niche of purchasing trucks in bulk, leasing them, and running the trucks to generate profits for those who had put up the capital to acquire them.

19. Moshier herself decided to invest in Lunsford's program. She formed Mo7 for the purpose of investing. Through Mo7, Moshier invested $100,000 into the program in the early months.

20. In early 2024, Lunsford recruited Moshier to find others to put up capital to purchase truck leases and enter his leasing program.

21. Moshier agreed to do so in exchange for credits towards her own trucks in the program. By May 2024, by working for Lunsford's companies from her residence in Parrish,

Florida, Moshier had earned sufficient credits to begin receiving contracts for trucks.

22. On or around June 18, 2024, Lunsford sent Moshier at her residence in Florida contracts for trucks representing compensation for her services recruiting Participants. The contracts were made in the name of Mo7, Moshier's single member LLC created for the purpose of participating in Lunsford's program. A screenshot of the DocuSign transmission from Lunsford is attached hereto as Exhibit A. For unknown reasons, Lunsford did not sign these contracts and later voided them in the DocuSign system, making them unavailable at this time, although the parties acted as if they had been signed.

23. Moshier had told her friend, Sharon Minard ("Minard"), about the program in January 2024. Minard did not have experience in the trucking industry. Minard sought advice about the business model from two people: a friend who was a truck driver, and a member of her extended family with 35 years of experience in the trucking business.

24. Both the friend and the family member spoke with Lunsford on multiple occasions. They were positively impressed by the business model. They told Minard that they found the program credible. They both decided to buy into the program themselves and contracted directly with Lunsford's companies.

25. Minard's parents and another family member also bought into the program around this time.

26. Minard herself invested $50,000 in the program through her company, DSM.

27. In or around May 2024, Minard also began recruiting for the program in exchange for credits towards being assigned trucks under the program.

28. On or around June 19, 2024, Lunsford sent Minard contracts for a truck, representing compensation for her recruiting services. Copies of the contracts entered into for her

5

first truck lease, in the name of her corporation DSM, are attached hereto as Composite Exhibit B.

29. Moshier and Minard told their friend Julie Galli ("Galli") about the program. Galli did not have experience in the trucking industry.

30. Lunsford told Moshier, Minard, and Galli that his business was going so well that he was having a difficult time administering new lease contracts and the weekly payments to existing lessees, while simultaneously purchasing trucks, finding drivers, and entering agreements with carriers to carry loads.

31. He sent Moshier a screenshot of all the outgoing funds transfers for payments that he had to process each week to show her how heavy the administrative burden had become.

32. He presented Moshier, Minard, and Galli with an opportunity to act as a third-party sales and administrative provider. He requested their help with the recruiting and signing new clients on the front side, and processing weekly payments on the back side. This would allow Lunsford to concentrate on purchasing trucks, finding drivers, and entering agreements with carriers to carry loads. He offered that they would be allowed to mark up the purchase price for new clients that they recruited and earn a residual from the weekly payments. He also offered them the right to purchase trucks[2] for themselves at a discounted price. (This price was usually $27,000).

33. All three were convinced that Lunsford had found a profitable market niche of purchasing trucks in bulk and leasing them at rates that generated profits.

34. They had taken reasonable steps to verify the business opportunity.

35. Lunsford had provided Moshier with a copy of AKL's registration with the U.S.

---

[2] To be clear, under the program, participants provided a payment for the right to lease a truck with an option to buy at the end of a five-year term. They were essentially purchasing a lease. Although the participant would sign a lease for the truck, all referred to this as buying or purchasing a truck, and so that terminology is also used herein.

Department of Transportation.

36. They had no reason to question Lunsford.

37. The three formed MGM on July 22, 2024. MGM became a recruiter and a pass-through administrator for Lunsford's companies. When MGM was formed, 29 existing lessees were transferred to MGM for purpose of passing through their weekly payments.[3]

38. According to the contracts defining the roles and duties of the parties, MGM would act as a middleman between a "Participant" and companies in the "MGM Network", specifically Southern and AKL. MGM would accept a "Participant's Participation Fee" for the truck lease with Southern. On the back MGM would receive payment from AKL of funds generated by the truck, pay the lease payment due to Southern, and pay net income to the Participant.

39. Lunsford made clear to the founders of MGM that what they would be offering was a service. He told them that Participants were not making an investment and that returns were not guaranteed. If AKL failed to generate satisfactory revenues for the Participants, the Participants would be free to take their leased trucks and run them themselves, or terminate the lease with Southern and walk away.

40. Ms. Galli was one of the first to become a Participant through MGM. She paid a discounted Participant's Participation Fee through her limited liability company PGS for her first truck. A copy of the contracts memorializing her participation through MGM is attached hereto as Composite Exhibit C.

41. Throughout their time working with Lunsford, Lunsford took actions to give MGM and its principals confidence in his program. For example, on July 30, 2024, Lunsford held a video

---

[3] Lunsford offered to pay them $25 per payment that they administered payment to lessees that Lunsford already had contracts with.

call with Moshier to show her trucks that he had purchased being unloaded at his yard.

42. Moshier, Minard and Galli had complete faith in Lunsford's business program. As such, they promoted it to their friends, families and others who they hoped would benefit. Sharon Minard's daughter was also one of the first to purchase a truck.

43. MGM charged no markup or residuals for many of the Participants it recruited because they were friends of family of MGM's principals. MGM earned nothing on approximately half of its Participant recruitments.

44. Moshier, Minard and Galli applied much of the monies that MGM did earn into additional trucks in the program held in the name of their LLCs. All three of MGM's principals also purchased trucks with funds that were not generated by MGM.

45. From approximately August 2024 to March 2025, MGM signed Participants into the program and administered payments.

46. From approximately August 2024 to March 2025, MGM received funds for the Participant Participation Fees into its bank accounts in Bradenton, Florida, retained its markups, and would weekly send the bulk of those funds, usually around $30,000 per participant, in aggregate, from its accounts to Southern in Georgia.

47. From approximately August 2024 to March 2025, usually on Wednesdays, AKL would transfer to MGM's accounts in Florida funds representing weekly payments for trucks in the program belonging to Participants recruited by MGM, as well as others that Lunsford had recruited and that Lunsford had asked MGM to administer. MGM would then transfer from its accounts the earnings to the Participants on Fridays of the same week, as well as the $700 per truck lease payments to Southern.

48. Throughout this time, MGM's principals continued to have faith in the program.

They all continued to purchase trucks through their LLCs.

49. Minard's corporation, DSM, invested an additional $846,000 to purchase trucks.

50. Moshier's corporation, Mo7, invested an additional $278,000 to purchase trucks.

51. Galli's corporation, PGS, invested $176,000 to purchase trucks.

52. MGM Elite LLC also purchased a truck, investing $27,000.

53. These investments continued through the first quarter of 2025. On Feb 26, 2025, Galli's company PGS purchased a truck. On February 27, 2025, Moshier's company Mo7 purchased two trucks. On March 6, 2025, Minard's company DSM purchased three trucks.

54. On March 1, 2025, Lunsford invented a pretext to avoid communicating directly with MGM. For approximately the next two weeks, he communicated to MGM by providing information to Joshua Tannariello.

55. In early March 2025, Lunsford communicated to MGM that he was having trouble with his banking platforms.

56. This representation was false.

57. On Friday March 6, Lunsford told Joshua Tannariello several different times during the day that he was at Chase bank attempting to send MGM wires. He claimed that the bank initiated the wire, and that it was waiting for a second signer. These representations were false. Galli spent the day watching bank accounts and calling the banks to see if any incoming wires were pending. There were no pending wires.

58. Lunsford failed to make the payment due that week.

59. Lunsford gave a number of excuses for failing to make the weekly payments that were due to MGM's customers, including that Bank of America had frozen $14 million. He informed MGM that Bank of America would be releasing those funds on March 14.

9

60. On information and belief, these representations were false and intended to induce MGM to agree to what appeared to be a sensible workaround. Lunsford proposed that because he was unable to get wires through to MGM, that Participant Participation Fees held by MGM and due to Southern would be credited by Southern without it receiving the funds, and that those retained funds could be used by MGM to pay AKL's obligations to existing truck owners.

61. After the funds supposedly held by Bank of America were not released on March 14, Lunsford communicated that the issue was no longer solely banking platform issues, but that only 20% of his fleet operated over the holiday/winter season, affecting his ability to make payments.

62. On March 18, 2025, Galli, Moshier, and Lunsford spoke by phone. Lunsford said that he was starting a relationship with a new bank that operated differently and so he would be able to resume making payments. This representation was false. Lunsford made it to forestall any remedial action from MGM.

63. In this same call, Lunsford also told MGM not to worry because MGM was just a pass-through; that the contracts were between his companies and the Participants, not MGM and the Participants, and so MGM had zero liability for any missed payments. He further stressed that Participants were not guaranteed returns or interest; that this is not an investment; but rather that Participants were offered a service of managing trucks and could cancel that service if they were dissatisfied with it.

64. On March 21, 2025, MGM made its last weekly payments to Participants and notified clients that onboarding of new Participants was paused.

65. In late March, concerned that Lunsford needed help deploying trucks, and with the hope that Lunsford could still turn the situation around, MGM contacted resources within the

trucking industry to try and assist Lunsford with carriers. MGM connected Lunsford with a Freight Broker to help Lunsford get trucks on the road. Also, a business owner in the trucking industry offered Lunsford thousands of loads to get the trucks moving. Lunsford never took either offer. Lunsford did not react in the manner he should have to contacts that could have gotten his business back on track by putting trucks on the road. On information and belief, the problem was not that Lunsford had trucks that were not deployed, but that Lunsford did not in fact have as many trucks in his fleet as he claimed.

66. At around that time, MGM requested proof of the funds that carriers were sending to Lunsford in order to verify his business. He never provided it. He instead claimed that he would soon make a partial payment of the funds generated by running the trucks, but did not do so.

67. On March 27, a direct client of Lunsford contacted MGM. He informed that he had also not been paid. He then sent MGM a list of 33 VINs corresponding to trucks he had leased from Southern. MGM found 8 duplicates with VINs assigned through MGM.

68. On April 3, another non-MGM client provided a list of 32 VINs it claimed Lunsford had assigned to it. Five out of the 32 were duplicates with VINs assigned to MGM clients.

69. While a truck could possibly be moved from one Participant to another, causing its VIN to be assigned to different Participants at different times, this incidence of duplicates caused MGM to question how many trucks Lunsford had in his fleet.

70. On or around April 3, 2025, Galli requested that Lunsford supply a list of the VIN numbers for the 171 most recent truck sales. He did not.

71. On information and belief, Lunsford had been assigning the same VIN numbers to leases of Participants recruited by MGM as well as to leases recruited by himself and others. Lunsford was effectively selling the same truck lease multiple times. Each transaction was a sham,

11

as there was in fact no truck leased from Southern exclusively to the Participant, and then leased by the Participant to AKL.

72. On information and belief, Lunsford had at least one other company, Automated Trucking, LLC, recruiting clients for his companies.

73. On information and belief, the revenues Lunsford generated from trucks in his program were not sufficient to pay the weekly payments due to Participants. On information and belief, this was because Lunsford either leased the same truck to more than one participant, overstated the revenues that trucks were generating, or both.

74. On information and belief, Lunsford used the funds from participation fees paid by later Participants to pay the weekly payments paid to earlier Participants.

75. On information and belief, Lunsford did not purchase as many trucks as he claimed to purchase, and did not place as many trucks into service each week as he claimed.

76. On information and belief, Lunsford diverted funds paid to Southern and AKL to his personal use and to insiders.

77. On information and belief, the intent of Lunsford's program was to create large cash flows that would enable Lunsford to divert funds so long as it continued.

78. In early April 2025, MGM's principals came to realize that Lunsford did not have the business that he said he did.

79. On April 8, 2025, MGM began refunding Participant Participation Fees it had received and retained after March 21, 2025, refunding a total of $1,080,000.

80. On April 15, 2025, MGM sent a letter to Defendants demanding an accounting, immediate remittance of payments owed, a full record of all VINs in his program, and a formal declaration by Defendants of intent to rectify the situation, along with a clear timeline for doing

so. Defendants did not respond.

81. On April 18, 2025, MGM sent an email to all MGM clients informing that it had suspended all further business with AKL and Southern.

82. From April 18 to April 23, 2025, MGM alerted its banks and requested reversal of all transfers to both AKL & Southern.

83. On April 18, 2025, MGM contacted numerous law enforcement and regulatory agencies to alert them that Lunsford appeared to be perpetrating a fraud.

84. MGM has hired undersigned counsel to, *inter alia*, recover its funds and funds belonging to Participants.

85. MGM has been sued by participants in two actions due to the fraud perpetrated by Lunsford through AKL and Southern: *STG Procuctions, Inc. et al., v. MGM Elite Trucking LLC, Case No. 2025 CA 003362 NC in the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida*, and *Sundance 2006, LLC et al., Case No. 25CV008418 in the Superior Court of Fulton County, Georgia*. MGM has incurred legal fees defending these actions, and faces potential liability in these actions.

86. Additionally, Plaintiff MGM has been subjected to legal process from the United States Securities and Exchange Commission, which has opened an investigation titled *AKL Transport LLC (FL-04403)*.

87. Through no fault of its own, but rather through the fault of Defendants, Plaintiff MGM was unable to pay the pass-through payments to Participants.

88. At all times relevant hereto, AKL and Southern acted as the alter egos of Lunsford for the purpose of perpetrating a fraud on Plaintiffs and others that Plaintiff MGM might and did recruit.

89. At all times relevant hereto, AKL, Southern, and Lunsford acted in concert to perpetrate a fraud.

90. Both of Lunsford's companies (AKL and Southern) were incorporated by or on behalf of Lunsford in furtherance of a scheme.

91. AKL and Southern were legal in form, but in fact were a sham created by or on behalf of Lunsford to further his scheme.

92. Lunsford individually or in consort with others dominated and controlled every aspect of the activities of AKL and Southern, and they were his alter egos.

93. At all times relevant hereto, Lunsford and Southern acted in a fiduciary capacity for Plaintiffs and Plaintiff MGM's clients by accepting payments as deposits for the purchase of trucks to be made in their best interests.

### COUNT I – FRAUD BY ALL PLAINTIFFS AGAINST AKL, SOUTHERN AND LUNSFORD

94. Paragraphs 1-93 are incorporated herein.

95. As alleged herein, Lunsford acting individually and through Southern and AKL, perpetrated a fraud against MGM, DSM, Mo7, and PGS, and the public, so that Defendants could generate massive cash flows and so that Lunsford could divert funds to himself.

96. Lunsford made many misrepresentations to Plaintiffs in order to carry out his fraud. For example:

    a. For every lease administered by MGM, Lunsford purported to assign a VIN identifying the truck that was leased. The transmission and delivery of each lease was a false representation. In fact, Lunsford assigned the same VIN to multiple leases, effectively leasing the same truck to different Participants at the same time. There were no exclusive leases of trucks by Southern to Participants,

and no exclusive leases by Participants of trucks to AKL.

b. On June 17, Lunsford sent a text to Moshier at her home in Parrish, Florida providing pictures of titles of trucks that he had purchased for exclusive assignment to the Participants she and Minard had recruited into the program. In fact, he either had not purchased those trucks, or had assigned them to other Participants simultaneously.

c. On several occasions, Lunsford personally showed Moshier, Minard, and Galli trucks on a lot in Logansville, Georgia. On those occasions, he stated that all of the trucks on the upper lot were owned by Southern. On information and belief, these representations were false. On information and belief, Lunsford only had space for 10 trucks at that location.

d. In late October 2024 Lunsford text messaged Moshier at her home in Florida documentation purporting to show that he had purchased a holding lot in Mulberry, Florida to house the many trucks that Southern was putting into its program. This representation was false and was intended to create the impression that Lunsford was increasing capacity due to the many trucks in his program.

e. For every payment AKL made to MGM, AKL purported to be providing funds representing revenues solely generated by running the trucks leased by Participants. The transmission of those funds constituted false representations. In fact, those funds were not solely generated by running trucks leased by Participants, but were generated at least in part from new participation fees.

97. The intentional misrepresentations made by Defendants were material, as Plaintiff

MGM did rely on such misrepresentations in deciding to work with Defendants and to send funds belonging to MGM as well as MGM's clients to Defendants, with resulting detriment and loss to Plaintiff MGM.

98. The intentional misrepresentations made by Defendants were material, as Plaintiffs MGM, DSM, Mo7, and PGS relied on such misrepresentations in deciding to invest their funds purchasing trucks.

99. Initially, AKL made payments to Plaintiff MGM, both for trucks owned by Plaintiff MGM and to be passed through to DSM, Mo7, and PGS, as well as Plaintiff MGM's customers, so as to create an apparent favorable atmosphere and induce further payment of participation fees. At least some of these payments were falsely characterized as revenues generated from trucks, when in fact they were not.

100. Defendants intentionally made misrepresentations to Plaintiff MGM specifically to induce Plaintiff MGM to recruit Participants for its fraudulent scheme, as well as to induce all Plaintiffs to purchase truck leases themselves. These misrepresentations did induce Plaintiff MGM to recruit Participants for its fraudulent scheme, as well as induced all Plaintiffs to purchase truck leases themselves.

101. At all times relevant hereto, Defendants intended to run a scheme of selling the same truck lease to multiple parties and to forestall discovery of this practice by paying early Participants, not from funds generated by running trucks, but from later participation fees.

102. Plaintiffs were harmed financially by this scheme as alleged herein in several ways, including:

    a) by investing their own funds with Lunsford as Participants, and losing those funds; and

b) by passing through the funds of other Participants, which, when Defendants ceased making payments, resulted in MGM and its principals being sued, as alleged herein.

Wherefore, Plaintiffs seeks remedies including compensatory damages, punitive damages, an accounting, disgorgement, an injunction against transferring funds to insiders, the appointment of a receiver, indemnification against lawsuits brought by others, and attorneys' fees under the wrongful act doctrine and any other relief the Court deems proper.

### COUNT II – UNJUST ENRICHMENT BY ALL PLAINTIFFS AGAINST AKL, SOUTHERN, AND LUNSFORD

103. Paragraphs 1-93 and 96 are incorporated herein.

104. Plaintiff MGM conferred a benefit on Defendant Southern by paying its clients monies for the lease of trucks.

105. Plaintiffs MGM, DSM, Mo7, and PGS conferred a benefit on Defendant Southern by MGM paying their monies or causing their monies to be paid to Defendant Southern for the lease of trucks.

106. Defendant Southern received monies for the readying and maintenance of trucks.

107. The trucks were not purchased, had already been assigned to other Participants, or were assigned to multiple Participants. Funds to purchase truck leases were withheld by Defendant Southern.

108. Alternatively and additionally, Defendant AKL has wrongfully withheld payments owing to Plaintiffs and others Plaintiff MGM had recruited.

109. Defendant Lunsford has wrongfully received funds personally from Defendants AKL and Southern.

110. Defendants would be unjustly enriched should they be allowed to maintain possession of the funds that they have withheld.

111. Plaintiff faces claims for these funds from those who paid them to Plaintiff for pass through to Defendant AKL.

Wherefore, Plaintiff seeks remedies including an accounting, disgorgement, the appointment of a receiver, indemnification against suits brought by others, an injunction against transferring funds to insiders, and any other relief the Court deems proper.

**COUNT III – ACCOUNTING AGAINST AKL, SOUTHERN, AND LUNSFORD**

112. Paragraphs 1-93 and 96 are incorporated herein.

113. AKL acted in a fiduciary capacity for Plaintiff MGM and the Participants in the program, including MGM, DSM, Mo7, and PGS, by accepting payments as deposits for the purchase of trucks to be made in their best interests.

114. At all times relevant hereto, AKL recruited Participants directly, as well as through a number of similarly situated entities, both known and unknown.

115. Rather than use the funds as it had promised, it intermingled them, and paid them out to others.

116. AKL breached its fiduciary duty by diverting payments for unauthorized purposes, including covering operational losses and personal enrichment to Lunsford and other insiders.

117. Defendants, acting in concert, committed fraud, as alleged herein.

Wherefore, Plaintiffs seek an order requiring Defendants to provide a full accounting of their truck leasing program and all payments made to and from it.

**COUNT IV – INDEMNIFICATION (MGM AGAINST ALL DEFENDANTS)**

118. Paragraphs 1-93 and 96 are incorporated herein.

119. At all times relevant hereto, a special relationship existed between Plaintiff and Defendants based upon Defendants' request that Plaintiff act as its agent for soliciting customers and for administering payments due to them, as alleged herein.

120. This special relationship placed Plaintiff in the position of a pass-through between Defendants and the Participants in their truck leasing program.

121. At all times relevant hereto, Defendants promised to Plaintiff that Defendant alone was contractually responsible for providing the funds to pay the weekly payments owed to the Participants in their program.

122. Defendant wrongfully failed to make payments to Participants in their truck leasing program.

123. Defendant wrongfully diverted capital payments from Participants in their program.

124. Plaintiff MGM is not at fault for the losses suffered by Participants.

125. Plaintiff MGM has been sued twice by Participants for Defendants' wrongful acts, as alleged herein, and likely faces further legal action as well.

126. Plaintiff MGM's liability for Defendants' failures to pay Participants in their program would be vicarious, constructive, derivative or technical.

127. Defendants' conduct constitutes wrongful acts; these acts caused Plaintiff MGM to be sued; Plaintiff MGM has incurred attorneys' fees and costs, and Plaintiff MGM faces liability to third parties for Defendants' wrongful acts.

Wherefore, Plaintiff MGM seeks an order that Defendants indemnify Plaintiff MGM from any liability in the two actions that have been brought by Participants in Defendants'

program against Plaintiff MGM thus far, as well as any that may be brought, including that Defendants be made to advance attorneys' fees and costs for the defense of all such actions.

## JURY DEMAND

Plaintiffs demand trial by jury.

September 18, 2025

Respectfully submitted,

*/s/ John Thornton*
John Thornton
Orlando do Campo
**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Suite 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 18, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ *John Thornton*
John Thornton